*IN ERROR.*
......

ALBANY,
March, 1812.

Post
v.
Kimberly.

HENRY POST AND JOHN
W. RUSSELL,                }      *Appellants,*

                              *against*

ANSON KIMBERLY AND THO-
MAS K. BRACE,              }      *Respondents.*

A. & M. part- THE respondents filed their bill in the court of chancery
ners, owned
three fourths against the appellants, on the 1st *April,* 1807. The bill stated
of a vessel,
and B. & K. that the respondents, and *Zeno Archer* and *William M'Conehey,*
partners,own-
ed the one merchants, under the firm of *Archer & M'Conehey,* were the
fourth; they
agreed to fit joint owners of the schooner *Elizabeth;* the latter being owners
her out on a of three fourths, and the respondents of one fourth. In *August,*
voyage from
*New-York* to 1806, the *Elizabeth* was fitted out with a cargo of goods, to the
*Laguira.* A.
& M. purcha- amount of about 16,000 dollars, and sailed under the command of
sed three
fourths of the *William M. Robbins,* from *New-York* to *Laguira,* on the
cargo, and *Spanish Main.* *Archer* and *M'Conehey* purchased the cargo for
chiefly, if not
wholly, with themselves and the respondents; they paid for and owned three
notes lent and
advanced to fourths, and the respondents one fourth. The *Elizabeth* ar-
them by P. & rived at *Laguira,* in *September,* 1806. *M'Conehey* was ap-
R. commis-
sion mer- pointed supercargo, and arrived in the brig *Hiram,* at *Laguira,*
chants. B. &
K. purchased and there took charge of the cargo of the *Elizabeth,* and having
the other
fourth of the cargo, for which they paid their own money, and shipped the same on board the ves-
sel; but it was not distinguished from the rest of the cargo by any particular marks; and the whole
cargo was to be sold at *Laguira,* for the joint account and joint benefit of the owners, A. & M. and
B. & K. M. went out as the supercargo and agent; and having sold the cargo at *Laguira,* he in-
vested the proceeds in a return cargo, with which the vessel set sail for *New-York,* but was obli-
ged, by stress of weather, to put into *Norfolk,* where M. sold the return cargo, except a small par-
cel of coffee, and for the avails received bills of exchange which he endorsed and remitted, with the
parcel of coffee, to P. & R. to whom A. & M. were jointly indebted, and M. on his private account,
to a greater amount, for advances made at the time of the purchase of the outward cargo. P. &
R. collected the bills and sold the coffee so remitted, and applied the same to the payment of the
debts so due to them from A. & M.

P. & R. had notice, if not at the time of the shipment of the outward cargo, certainly before
the bills remitted by M. were collected, and the coffee sold and converted into money, that *B.* &
K. were interested in, and owned *one fourth* of the cargo, so sold by M.; and B. & K. demanded
of P. & R. their proportion of the proceeds so remitted by M., after deducting commissions, &c.
but P. & R. refused to pay or deliver the same, alleging their right to retain the same, for the
payment of the debt due to them from A. & M.

It was held, that there was no *partnership* existing between A. & M. and B. & K., so as to ren-
der the disposition of the return cargo, by M. binding, as the act of a partner, on B. & K. That
there was no agreement constituting a partnership, in the purchase of the outward cargo, or to
share jointly in the *ultimate* profit and loss of the adventure: and though there might be a part-
nership, so far as respected the transportation and selling of the outward cargo, for the joint profit
and loss of the owners; yet it terminated with the sale of the outward cargo; and their interest
in the return cargo was separate and distinct, each being entitled to his respective proportion of it,
without any concern in the profit or loss which might ultimately arise; and that P. & K. not having
received the bills in the course of trade, and knowing of the interest of B. & K. before the bills were
paid, had no right to retain their share, for the payment of the debt of A. & M. but must account
to B. & K. for their proportion: And that a bill for a discovery and account by them against P. &
R. was sustainable in the court of chancery; that court having a concurrent jurisdiction with the
courts of law in all matters of account.

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

disposed of it, invested the proceeds in coffee, to the amount of 12,629 dollars and 23 cents, with which he set sail in the *Elizabeth*, for *New-York ;* but she was compelled, by stress of weather, to put into *Norfolk*, in *Virginia*, where she arrived the 26th *October*, 1806, in so injured a state as to be unable to proceed with her cargo to *New-York*. *M'Conehey*, as surpercargo and agent for the concerned, sold the greater part of the cargo, for which he received bills of exchange, to the amount of 12,550 dollars, and transmitted them endorsed, together with 72 bags and 5 barrels of coffee, the residue of the cargo, to the appellants, who were partners in trade in *New-York*, under the firm of *Post & Russell*, in order that they might collect the bills and dispose of the coffee, being 9,355 pounds, worth about 2,700 dollars, for the benefit of the concerned. *M'Conehey* also paid in cash to *Cornelius Grinnell*, the agent of the appellants, two hundred dollars, part of the proceeds of the cargo, to be accounted for by the appellants to the owners of the cargo, according to their several interests therein. All the bills were accepted and paid to the appellants, or otherwise converted to their own use, so that they hold of the proceeds of the cargo 15,750 dollars, one fourth part of which the respondents claim as their own property.

The respondents further alleged in their bill, that after the bills of exchange and coffee were received by the appellants, and before the bills became due and payable, to wit, on the 10th *February*, 1807, and often before and afterwards, verbally and in writing, they gave notice to the appellants, that they, the respondents, were separately interested in one fourth part of the proceeds of the cargo, and requested the appellants to pay to them their proportion of the same, which the appellants refused to do.

The respondents prayed that the appellants might account with, and pay over to them their proportion of the bills of exchange and coffee, or of the proceeds thereof, deducting therefrom such commissions as the appellants might be justly entitled to.

The appellants, in their answer, admitted that the respondents and *Archer & M'Conehey* owned the *Elizabeth*, as stated in the respondents' bill, but that they were not informed of the fact until after the schooner returned from *Laguira* to the *United States ;* that they did not know who fitted out the schooner, or that any person except *Archer & M'Conehey* had any interest in her cargo ; that the appellants came under engagements and responsibilities, (which they have since discharged,) and made advances for *Archer & M'Conehey*, to the amount of about 12,000 dollars,

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

which they believed were applied to the purchase of goods ship* ped by *Archer & M'Conehey*, in the schooner, to *Laguira*; and that those advances were made and responsibilities incurred, by the appellants, on the promise and assurance of *Archer & M'Cone- hey*, that the return cargo, the avails of the property so pur- chased, should be deposited in the hands of the appellants, who should be paid thereout the whole amount of their advances and other debts, due by the firm of *Archer & M'Conehey* and by *M'Co- nehey*, in his own right, with the usual commission on the sale of such return cargo; that they should not have made the advances and incurred the responsibilities for *Archer & M'Conehey*, had they not believed that *Archer & M'Conehey* were solely interested in the adventure. They admitted that *M'Conehey* went out as super- cargo, but were ignorant of any agreement between the owners of the *Elizabeth* and her cargo, on that subject; that *Cornelius Grinnell,* the agent of the appellants, purchased at *Laguira*, and shipped on board of the *Elizabeth*, 150 quintals of coffee, con- signed to the appellants, for which *M'Conehey*, as owner of the schooner, signed bills of lading, and which coffee was worth 4,000 dollars; that after the arrival of the *Elizabeth* at *Norfolk*, as sta- ted by the respondents, the appellants received several letters, from *M'Conehey* advising them of his intention to sell his property there and remit bills to the respondents. But in none of his let- ters did *M'Conehey*, at any time, mention any other persons ex- cept *Archer*, as having any interest in the voyage; but regrets, that his remittances to the appellants were not more; that the pro- ceedings of *M'Conehey* were known to *Archer*, who appeared to approve of them, and prior to the receiving of the bills, persuaded the appellants to make further advances to *Archer & M'Conehey*, under the assurance that the property coming from *M'Conehey* should be received by the appellants, who might repay them- selves out of it, for all their demands against the firm of *Archer & M'Conehey*, and *M'Conehey* himself, in his own right. That in *November*, 1806, the appellants received from *M'Conehey* the bills of exchange and 72 bags and 5 barrels of coffee; but the coffee was marked as the coffee shipped by *Grinnell* at *Laguira*, and which the appellants claimed as their property. That it was not true that the bills of exchange and coffee were sent to the ap- pellants, with any directions, or any intimation, that the bills were to be collected, and the coffee sold by them, as agents, or for the benefit of the concerned; but that, on the contrary, the bills were

3

IN ERROR.
......
ALBANY,
March, 1812.
POST
v.
KIMBERLY.

transmitted to the appellants, as principals, in their own right, and for their own benefit only, in part payment of the debts due to them from *Archer & M'Conehey*, and *William M'Conehey;* and that the coffee was received by the appellants, as part of the shipment made on their account and consigned to them, by *C. Grinnell;* and that the bills of exchange were received in payment of the residue of the coffee so shipped to them; and that the proceeds of the bills of exchange were passed to the credit of *Archer & M'Conehey*, and *William M'Conehey*. That 170, not 200 dollars, part of the proceeds, were paid to *C. Grinnell*, by *M'Conehey*, not for the purpose of being accounted for by the appellants, as stated in the respondents' bill, but in part payment of the said debts due to the appellants; that the whole amount of the bills and coffee, so received by the appellants, including the sum of 170 dollars, was 14,024 dollars and 25 cents; and they denied that any part of it was the sole property of the respondents, but, as it appeared from the appellants' own statement, was an undivided partnership concern with *Archer & M'Conehey*. The appellants admitted, that after the bills and coffee came to their hands, but not before they had received and accepted the same, and had passed the same, or so much as did not belong to them, to the credit of *Archer & M'Conehey*, and of *William M'Conehey*, *Kimberly*, one of the respondents, called on them, and alleged that the respondents were interested in one fourth of the proceeds of the cargo, but they did not recollect that he asserted such interest to be separate and distinct from that of *Archer & M'Conehey*. The appellants admitted that they were requested by the respondents to account to them for their proportion, which they refused to do, believing that they had a good right to hold and apply the property to the payment of the debts due to them from *Archer & M'Conehey* and *William M'Conehey*.

A general replication was filed to the answer of the appellants.

*William M'Conehey*, who was a witness for the respondent, testified that in *August*, 1806, the *Elizabeth* was fitted out with a cargo for *Laguira;* that himself and *Zeno Archer*, under the firm of *Archer & M'Conehey*, were joint owners of three fourths of the cargo, and that the respondents were separately interested in, and owners of, one fourth thereof; that when the witness was about purchasing the cargo, he told the appellants that the respondents were to be so interested; that the respondents themselves purchased and paid for their said proportion, consisting chiefly of bran-

dy; and that *Archer & M'Conehey* purchased the other three fourths; that the goods composing the outward cargo were not distinguished by particular marks, designating to whom they belonged; nor was there any writing, other than invoices and bills of lading, specifying the different articles belonging to the different owners. He proved the sailing to *Laguira*, his going there as supercargo and agent for the several owners; the sale of the cargo there, the purchase of a return cargo, and the vessel's being driven into *Norfolk*, the sale there, and that the proceeds, and the 72 bags and 5 barrels of coffee, were transmitted to the appellants for the benefit of the persons concerned, but he did not consider the appellants as the agents of the respondents; that the cargo was not sent to *Laguira*, as partnership property, the owners being only interested in the profit and loss, according to their respective proportions of the property; but that the respondents were separately and distinctly interested in, and owners of, the one fourth part of the outward and return cargoes; and whenever the respondents had exceeded their proportional part of the disbursements for the outfits of the schooner, the remainder was not charged by them to the schooner, but to *Archer & M'Conehey* in account; that the funds for the purchase of the three fourths were derived from the endorsements of the appellants, though 3,000 dollars were advanced by *Archer & M'Conehey* to the appellants; that in order for the appellants to make the endorsements and advances, the witness assured them that they should be reimbursed out of the said cargo; but he said nothing to them about commissions, or any debt due from him individually, or from *Archer & M'Conehey;* and that at the time of purchasing the cargo, he told *J. W. Russell*, one of the appellants, that the respondents were interested in one fourth part of the cargo, and had the same on board, and that *Archer & M'Conehey* would not want endorsements for more than their proportion. That *Cornelius Grinnell* did not ship any coffee in the schooner at *Laguira*, but having a claim on the witness, which was to be satisfied out of the property on board of the *Hiram*, as well as that on board of the schooner, the witness, in order to secure *Grinnell*, by enabling him to make insurance on property sufficient to cover his claim, signed a bill of lading for 150 quintals of coffee, on condition, however, that in case the cargoes arrived safe, the bill of lading should be void. That the bills of exchange and coffee were remitted by the witness to the appellants; that *Archer & M'Cone-*

IN ERROR.
......
ALBANY,
March, 1812.
⁓⁓
POST
v.
KIMBERLY.

*hey* were indebted to them at that time ; though he did not know to what amount; but that he never intended that the part or proportion of the respondents should be applied to the reimbursement or repayment of the appellants; that he had no recollection of mentioning in any of his letters the application of the remittances ; but as the appellants had made advances, he did not wish to keep the proceeds out of their hands ; and meant to deposite them with the appellants, until he could come to *New-York* and make the necessary arrangements as to the appropriation of the three fourths.

*Zeno Archer* deposed that, in *August*, 1806, when the *Elizabeth* was fitted out for *Laguira*, he told *Russell*, one of the appellants, that the respondents were owners of one fourth part of the vessel and cargo; and he and his partner, *M'Conehey*, owned three fourths, which fact he believed was also known to the other appellant; that the witness negotiated and made the purchases for the outward cargo; that the respondents gave their notes for the one fourth part thereof, which were all paid; and that the respondents were interested in, and owners of, one fourth part of the outward and homeward cargo, and of the proceeds and avails thereof, separately and distinctly from *Archer & M'Conehey*. On his cross-examination, he said that there was no division made of the articles composing the outward cargo, so as to specify the particular parts belonging to each of the parties concerned ; that the articles purchased with the notes of the respondents were wines and brandies; but that the respondents were to share in the net proceeds of the whole cargo; that the cargo was sent to *Laguira* as a partnership property, in which the parties had an undivided interest, as to profit and loss, according to their respective proportions above mentioned. That in order to induce the appellants to make advances by giving their notes, *Archer & M'Conehey* assured them that they should be paid and satisfied, as soon as *Archer & M'Conehey* should be in funds from the proceeds of the cargo; and that he knew of no other promises or assurances made to the appellants, nor whether his partner owed them on his individual account.

The captain of the *Elizabeth* testified, that he believed the appellants were well acquainted with the respondents being interested in the vessel and cargo, as *Archer* had been doing business with the appellants ; and *Cornelius Grinnell*, who was then a clerk of the appellants, was well acquainted with the circumstance.

That there was a bill of lading for coffee, signed and delivered to *C. Grinnell,* at *Laguira,* by *M'Conehey,* or himself, which coffee was part of the proceeds of the outward cargo of the *Elizabeth;* that the bill of lading was given by *M'Conehey* with some reluctance; *Grinnell* had previously said that *M'Conehey* had deceived him, and they should sink on the *Hiram's* cargo; and after the bill of lading was given, *M'Conehey* told the witness he had now made *Grinnell* safe, or words to that effect.

*Grinnell,* who was a witness for the appellants, deposed that he was one third interested in the *Hiram's* cargo; that the appellants made the advances and engagements for *Archer & M'Conehey* for the purchase of the *Elizabeth's* cargo; and that they were induced to do so, in consequence of the agreement of *Archer & M'Conehey,* that the appellants should receive a commission of 2 1-2 *per cent.* on the amount of the advances, and that the return cargo should be placed in their hands to be sold, and, out of the proceeds, they were to reimburse themselves for their advances, and retain a farther commission of two and a half *per cent.* That the witness, as agent of the appellants, purchased at *Laguira,* on the joint account of the appellants, *Archer & M'Conehey* and himself, 152 quintals of coffee, which he shipped on board of the *Elizabeth,* and for which *M'Conehey* signed a bill of lading, which was produced, and was in the usual form. On his cross-examination, he said, that he got this parcel of coffee of *M'Conehey,* in order to make good some sacrifice which had been made in the disposition of the *Hiram's* cargo. After the arrival of the *Elizabeth* at *Norfolk,* the witness, at the instance of *Archer,* went to *Norfolk,* the better to collect the sales of the cargo, in order to pay the appellants; that when he arrived there *M'Conehey* informed him of his having already remitted to the appellants 8,500 dollars, and 72 bags and 5 barrels of coffee, and that he should be able to pay the witness 6,000 dollars in cash, which would nearly satisfy the appellants for their advances, &c.

That *M'Conehey,* afterwards, paid the witness about 3,900 dollars, on that account, and that in all his conversations with *M'Conehey,* there was nothing said by the latter about applying the remittances and payments to any other person than the appellants; and that the first time that the witness heard that the respondents were interested in the cargo of the *Elizabeth,* was some time after his return from *Norfolk* to *New-York,* in *December,* 1806; that *M'Conehey,* to secure the balance due to the appellants, while at

IN ERROR.
......
ALBANY,
March, 1812.
~~~
POST
v.
KIMBERLY.

*Norfolk*, transferred three eighths of the *Elizabeth* to them, and *Archer* afterwards made a similar transfer of his three eighths. That *Archer* expressed his satisfaction at the remittances made to the appellants, but did not suggest that any other person but himself and *M'Conehey* was interested in the cargo of the *Elisa-beth*, or in the avails of the return cargo; but on the contrary, when *Archer & M'Conehey* spoke of the adventure, they always mentioned it as their own.

Several letters were produced by the appellants, written to them by *M'Conehey* from *Norfolk*. One, dated the 27th of *October*, 1806, mentioned his arrival there, that he had much to communicate by the first opportunity, and that the *Hiram* was to sail 10 days after the *Elizabeth*. The letter, dated 1st of *November*, mentioned his having informed the appellants of his arrival, and had since particularly communicated the transactions of his last unfortunate voyage, to which he referred the appellants, being then too much indisposed to write more. The letter referred to, as containing the particulars of the transactions by *M'Conehey*, was not produced by the appellants. In his subsequent letters, he spoke of the remittances of two bills of exchange, and the 72 bags and 5 barrels of coffee; expressed his surprise at the arrival and mission of *Grinnell*, &c. but the further contents of these letters seem not to be important.

The cause was heard in *May*, 1810, and on the 15th of *September* the chancellor decreed, "that the appellants should pay to the respondents one fourth of the net proceeds of the return cargo of the *Elizabeth*, on her voyage from *Laguira* to *New-York*, and that it should be referred to one of the masters of the court of chancery to take an account between the parties, in which he should charge the appellants with the amount of one fourth of the sums which came to their hands in cash remitted from *Norfolk*, and such sums as were received by them on the sale of the coffee, part of the said return cargo, remitted to them in specie from *Norfolk*, with interest, and crediting them with all reasonable charges, disbursements and commissions."

The master having reported that there was due from the appellants to the respondents the sum of 4,835 dollars and 97 cents, the chancellor, on the 14th of *December*, 1812, confirmed the report, and ordered and decreed that the appellants should pay the sum so reported to be due, to the respondents, with costs.

From this decree an appeal was entered to this court.

*IN ERROR.*

......

ALBANY,
March, 1812.

Post
v.
KIMBERLY.

The *reasons* for the decree were thus assigned by

THE CHANCELLOR.    It has not been doubted that the respondents were originally concerned in the outfit of the schooner *Elizabeth,* on her voyage from *New-York* to *Laguira.* That the outward cargo was purchased, and laid in by distinct purchases of wine and brandy, by the respondents, to the amount of one fourth; and of wine and dry goods, by *Archer & M'Conehey,* to the amount of three fourths; that such outward cargo was carried to *Laguira,* there disposed of, and converted into coffee, the coffee partly sold at *Norfolk,* and partly remitted, in specie, with the proceeds of the sales to the appellants, were facts fully established by the pleadings and testimony; and there was no point presented for decision, as to the property of the remaining three fourths of the cargo. This narrowed the ground of controversy, and presented it in a less complicated point of view, than the mass of evidence and argument which had been connected with it, in its progress, seemed to admit of.

The appellants did not deny that they were in possession of the proceeds of the return cargo; but they alleged,

1. That they made certain advances, and incurred certain responsibilities, on the credit of the whole cargo, in consequence of an engagement with *Archer & M'Conehey.*

2. That the remittance of the return cargo was made to the appellants, without any reference to the rights of the respondents.

3. That notice was not given of the respondents' concern in the cargo, till after the return cargo was received.

The advances and responsibilities may be considered under two aspects.

1. As having been made with notice of the interest of the respondents.

2. As without it.

There was no pretence that the firm, *eo nomine,* had done any act to bind its interests collectively. The question was, whether one of the parties to the firm, without any reference to it, either directly or indirectly, or professing to dispose of its interests, could bind those interests?

If the advances and responsibilities for which an indemnity is sought by the appellants, by making them available to this defence, were made on the credit of the interests of *Archer & M'Conehey* in the cargo, and if, instead of a general ownership, a

partial one, either distinct or combined with the rights of others,
was all they were entitled to, it is evident that nothing could pass
by the act merely, limited to give that credit effect, but the rights
possessed by *Archer & M'Conehey.*   The appellants alleged that
they knew not the respondents in the transaction, and that they
had no interest in it.   It followed, of course, that if they had an in-
terest, it was not the object of the agreement made between them,
and thus the only property which could be affected by it was
that of *Archer & M'Conehey;* for the contracting parties either
not knowing or concealing the existence of the interests of the
respondents, could not possibly profess to bind it.

There was no right of disposition exerted by one, avowedly as
part of a commercial firm, and it was not a question how far a
partner exerting his right of disposition absolutely, is legally re-
strained in his acts.   This depended upon an executory contract,
in its form totally disregading the interests of the respondents; and I
know no rule of construction which could possibly justify intend-
ments that the contract embraced a partnership property in
which the respondents were interested, and hence it could not be
legally or equitably inferred that *Archer & M'Conehey* did not
limit their contract to their own rights only, as distinct from any
copartnership which might arise out of the manner of conducting
their adventure.   If this transaction assumed the complexion in
which it was presented to the court with full notice of the rights of
the respondents, it is evident they were not intended to be bound.
If they had no notice, it is equally clear that the reliance of the ap-
pellants was exclusively placed on the property of *Archer &
M'Conehey,* and that the right of the latter must inevitably limit
those of the former.

This appeared to me to conclude forcibly against the defence ;
but as I considered the second point equally untenable as a
ground of defence, it may be proper to state the view taken of
that also.

The appellants alleged in their answer, as respected this point,
*matter of avoidance,* which, as the replication put it in issue, it was
incumbent on them to support *aliunde.*   They have given no evi-
dence that the remittances to them were made in reference to, or
as connected with, any exclusive rights to the cargo.  On the con-
trary, *Archer & M'Conehey* (whose testimony was, however,
questioned) proved that the appellant, *Russell,* was informed, at the
time of the sailing of the schooner, of the interest of the re-

spondents in her cargo. *M'Conehey* stated that both the appellants possessed the same information; and *Grinnell* expressly stated that an agreement was made between the appellants and *Archer &* *M'Conehey,* that the appellants should receive 2 1-2 *per cent.,* not on the cargo generally, but on account of their advances, and that he purchased the 152 quintals of coffee, *as agent for the appellants,* but on their account and that of *Archer & M'Conehey.*

In the letters written to the appellants by *M'Conehey,* he says not a word as to the application of the remittance to the exclusive benefit of the appellants. He is entirely silent on the subject. If, however, he had clearly expressed his intent so to apply it, that, of itself, could neither control or impair the rights of the respond-ents, for he was agent for the appellants, and if he had been agent for both parties intrusted to dispose of the cargo, it would not make the appellants' case better.

There are some intrinsic circumstances which have a bearing on the point of notice. It appears that the outfit for the voyage to *Laguira* was made at the port of *New-York,* where the appellants resided; that the proportion of *Archer & M'Conehey* was furnished by the appellants, either in the specific articles of which it was composed, or on their credit; that they were vigilant and attentive to their interest, was, I thought, deducible from the evidence, and hence, as the outfit was made under their eye, it would seem im-probable that the mode of furnishing the one part of the cargo by the respondents, could have escaped their most superficial obser-vation. If they had the least intimation of that interest, while in the act of providing the cargo, and they exacted an engagement from *Archer & M'Conehey* to subject the articles purchased by the respondents to an indemnity for their advances, it seemed to me the duty as to notice would have been inverted, and that good faith required that the appellants should apprize the respondents of the agreement intended to affect their interest.

The question of partnership I did not think it necessary to exa-mine, being of opinion that whether there was a partnership or not, the appellants must account and pay over to the respondents the net proceeds of the return cargo.

In support of their appeal, the appellants stated that they should insist:

1. That *Archer & M'Conehey* and the respondents were *part-ners in the outward and return cargoes* of the *Elizabeth,* as evi-dently appeared, as well from the manner of laying in the outward cargo, as from the circumstance that they participated in the profit

and loss of the entire adventure, in proportion to their respective interests, and were *not severally and distinctly* to reap the profit and sustain the loss arising from those particular parts of the outward cargo, which they respectively paid for.

IN ERROR.
......
ALBANY,
March, 1812.
POST
v.
KIMBERLY.

2. That the appellants had made advances, and incurred responsibilities, for the purchase of the outward cargo, under the express stipulation of *Archer & M'Conehey*, the partners of the respondents, that the appellants should be reimbursed out of the avails of the property purchased with their money, and in the profits whereof the respondents were to participate.

3. That *Archer & M'Conehey*, after the sailing of the *Elizabeth*, reiterated their assurances, that the appellants should be reimbursed out of the proceeds of the outward cargo; that the return cargo should be consigned to them for that purpose, and that they should be allowed the customary commissions on the sale thereof; and, by that means, induced the appellants to make further advances, and incur further responsibilities, which, but for those assurances, they would not have made or incurred.

4. That the property remitted to the appellants from *Norfolk*, by *William M'Conehey*, the acting partner, who had the entire management of the business, was remitted by him in good faith, and in strict compliance with the stipulation entered into by him and one of his copartners, with the appellants, who, on the faith thereof, had expended large sums of money for the benefit of the whole concern, and with the terms whereof all the parties, who might eventually have been benefited thereby, ought in honour as well as in equity, to have complied.

5. That the remittances, although made with the honest intent of performing the engagements made with the appellants, were wholly inadequate to extinguish their claims, to the extinguishment whereof they were pledged.

6. That the property remitted in specie from *Norfolk*, as well as a considerable proportion of the bills, belonged to the appellants as their property, distinct from any claim of the respondents, inasmuch as it was purchased for them, by their agent at *Laguira*, in consideration of the relinquishment of a part of their profits, in the adventure of the *Hiram*, for the benefit of the parties concerned in the *Elizabeth*.

7. That considering the appellants as the agents or factors of the respondents and *Archer & M'Conehey*, yet, when the remittances were made to them by *M'Conehey*, there was a general

IN ERROR.

ALBANY,
March, 1812.

POST
v.
KIMBERLY.

balance of accounts due to the appellants from *Archer & M'Co-nehey* exceeding the whole amount of those remittances, and yet unsatisfied; and that they are entitled to retain the funds remitted to them, in part payment of that balance.

8. That laying out of view the fact of partnership, *M'Conehey* was the agent of all the parties concerned in the adventure of the *Elizabeth*, and as such agent and a part owner, he had the absolute disposal thereof; and that the respondents are bound by his appropriation thereof to the payment of a *bona fide* debt due from himself, and *Archer & M'Conehey* to the appellants; and if they have been wronged, they must seek for redress against him. The property in controversy must be lost by one party or the other, and there can be no reason why the appellants, who have had the good fortune to receive it, should be deprived thereof rather than the respondents, who retained *M'Conehey* as their agent.

9. That the remittances were principally in *bills of exchange*, which are to be considered as *cash payments*, and the appellants, consequently, no more liable, as far as respects those bills, than they would have been, had *M'Conehey* paid them the amount of their demand in money.

In support of the decree, the respondents stated that they should insist:

1. That they were the owners of the fourth of the *Elizabeth* and cargo, and had paid for the fourth of the cargo, and also had paid for the insurance of the vessel and cargo.

2. That the appellants were informed, *at the time* of the shipment of the said cargo, of the interest of the respondents therein.

3. That the appellants were informed of the interest of the respondents in the cargo after the shipment, and before any of the bills of exchange were paid or payable, and before the said coffee was sold and paid for.

4. That the cargo at *Laguira* was purchased with the proceeds of the cargo shipped at *New-York*, and *with no other funds*.

5. That the whole of the homeward cargo was received by the appellants, for the benefit of those to whom it belonged, in coffee, money, and bills of exchange.

6. That the bill of lading signed by *M'Conehey* is void, and if not void, cannot affect the interest of the respondents.

7. That the respondents are entitled to one fourth at least of all the property received by the appellants, and being a part of the proceeds of the outward or homeward cargo of the *Elizabeth*.

3. That the principles assumed by the appellants in vindica-
tion of their conduct, in retaining the whole of the said property
for alleged claims against *Archer & M'Conehey*, and *M'Conehey*
alone, are either inadmissible or inapplicable to a case circumstan-
ced like the one before the court.

*Hoffman*, for the appellants. The common and well known
principles of the law of partnership, and of the law as to the du-
ties and responsibilities of agents, are applicable to this case. The
respondents were jointly interested in the advances and purchases,
for the outward cargo, and were to share in the profits of the ad-
venture. They were so jointly interested at the commencement
of the enterprise. This is a controlling fact, and must be deci-
sive in the cause. This was a limited partnership, as it regarded
the specific purpose or enterprise, but general, *quoad* that adven-
ture or voyage. The equity of the bill is placed by the respond-
ents on its being a joint adventure. The testimony of *Archer* is
conclusive as to the fact that the property was sent to *Laguira*
as a joint or partnership interest. Suppose the wines and brandy
purchased with the money of the respondents had found a *losing*
market, and the goods of the appellants had sold at a *profit*, on
the principle of the chancellor's decree, not only the advances of
the appellants, but a proportion of the profits would be given to
the respondents. This is not a case where each party contri-
butes his *aliquot* part to an adventure. The appellants made
advances for the purchase of the whole cargo, not knowing that
the respondents had any share in it. The fund has been benefit-
ed by these advances. Suppose, then, there was not a strictly
legal partnership, will a court of *equity* take this fund out of
the hands of the appellants, where it has been placed by an
authorized agent for their security? The appellants and
respondents may be considered as both *bona fide* creditors of
*Archer & M'Conehey*, and their equity being equal, the party
having the legal right is to be preferred. Where one *bona fide*
creditor is in possession, a court of equity will not take the proper-
ty from him and give it to another creditor. There can be no ap-
portionment in this case. The whole property was pledged to
the appellants by the agent or partner of the respondents, or none.
If the respondents have the legal right, let them seek their legal re-
medy. A court of equity will not interfere.

IN ERROR.
······
ALBANY,
March, 1812.
⌣⌣⌣
POST
v.
KIMBERLY.

Again, there is no allegation in the bill that any notice was given to the appellants that the respondents were interested, until after the bills of exchange and coffee had been received by the appellants. The bill must set forth with precision the matter on which the equity of the claim is founded. This is a technical and unanswerable objection. The complainants must be confined to the case as stated in their own bill. A person receiving property, or papers, *bona fide*, without notice of the interest of a third person, is not to be disturbed in his possession of that property. The appellants were regular commission merchants, and it is not credible that they would have made advances to the amount of 12,000 dollars, without an adequate commission or profit.

Again, *M'Conehey* had a right to sell the cargo at *Norfolk*, and having sold it, he remitted to the appellants, for a part of the proceeds, bills of exchange payable to himself, and endorsed by him to the appellants, to pay them for the debts due to them from *Archer & M'Conehey*. The appellants were then *bona fide* holders of these bills, for a valuable consideration, and without notice of the interest of the respondents. Shall a third person behind the curtain, and who has his legal remedy against *M'Conehey*, now step forward, and prevail against the holders of these bills in equity ? Such a decision would be against the established principles relative to negotiable paper.

*Baldwin* and *Riggs*, contra. By the testimony of *Archer*, as well as that of *M'Conehey*, it is clearly proved that the respondents purchased, with their own money, one fourth of the cargo put on board the *Elizabeth;* and it appears from the same testimony, that the appellants, or, at least, one of them, had notice of the fact, at the time the shipment was made. The bill states, that " on the 10th of *February*, 1807, and often before and after, by writing and verbally, the respondents informed the appellants of their interest," &c. The answer denied the knowledge of the fact prior to receiving the bills; and the replication put that fact in issue. The respondents may, therefore, avail themselves of the facts in proof on that subject.

It is a rule of the court of chancery that the cause is put at issue by a general replication.* The fact, therefore, as to the time of the notice is put in issue, and must be determined by the proofs. It was not necessary that the bill should charge a *notice.* The appellants, in their answer, set up the want of notice as

* *Rules of Chanc.* 31. *Mitf. Pl.* 255. *Cooper's Eq. Pl.* 330.

essential to make out their title to the bills of exchange. Their
defence rests on the fact of a purchase made without notice.
But there is a sufficient averment in the bill of a notice ; the re-
spondents would not, even by the strict rule of pleading, at law,
be obliged to show the exact day. The general allegation was
sufficient. In *James* v. *M'Kernon,** the fraud was not put in
issue; but merely the execution of the contract. Here the ap-
pellants aver, and are bound to prove, a want of notice, and the
fact was put in issue; and by their cross interrogatories they did
go into the proof of want of notice.

It is said that the remedy of the respondents is at *law*. But
one partner cannot sue his copartner at law, until a settlement of
accounts and a balance struck between them. All matters of *ac-
count* are properly cognisable in a court of equity. Besides,
there is an allegation of *fraud* in the bill, and that is a proper sub-
ject for the cognisance of a court of equity.

*Holmes* v. *The United Insurance Company*† is a strong case
in point, to show that there was no partnership between the re-
spondent and *Archer & M'Conehey*. There must be an agree-
ment between the parties to constitute a partnership. There
was no agreement in this case, even to make a joint purchase.
In fact, the parties purchased separately. Persons may be joint
owners, without being partners. One partner cannot apply the
partnership funds, or use the partnership name, for his private
debts.‡

*M'Conehey*, as the agent of the respondents, could not bind them
beyond the scope of his agency. The attempt by *M'Conehey* to
make use of the property of the respondents, to pay his own debt,
was a *fraud ;* and it was also a *fraud* in the appellants, after no-
tice of its being the property of the respondents, to apply it to
that purpose. The bills of exchange were not received by the
appellants, in the course of trade, for merchandise sold; nor did
they make any advances on the credit of those bills. *M'Conehey*
was the *agent, supercargo,* or *factor* of the respondents, in
respect to the cargo, and the appellants dealt with him in that
character. As it respected that property, he was not a mer-
chant; and being a *factor* he had no authority to pledge the
property of his principal for his own debt.§ As long as the pro-
perty is in specie, whether in the form of bills of exchange, pro-
missory notes, or in any other shape, so that it can be identified,

*In margin:*

IN ERROR.
••••••
ALBANY,
March, 1812.
⌣⌣⌣'
POST
v.
KIMBERLY.
* 6 *Johns:*
*Rep.* 543.

† 2 *Johns.'*
*Cas.* 329.

‡ 2 *Caines'*
*Rep.* 246.  1
*Johns. Cas.*
171.  4 *Johns.*
*Rep.* 251.  7
*East,* 210.  1
*East,* 48.

§ 5 *Ves.* jun.
21.

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

* 2 Vern. 638.
1 Atk. 232.
234.   2 Atk.
623.   5 Term
Rep. 226, 227.
Stra. 1178.  5
Term Rep.
606.   1 P.
Wms. 314.  3
P. Wms. 185
—187. 1 Atk.
185.   Amb.
297.   Salk.
160.   3 Term
Rep. 757. 760.
† 4 Ves. 396.
‡ 2 Johns.
Rep. 280.

the principal has a right to pursue it in the hands of others. The owner's claim must prevail against creditors.*

Again, if the appellants had issued an execution for the amount of their debt, against *Archer & M'Conehey*, on the principle of a copartnership existing between them and the respondents, the *surplus* only belonging to *Archer & M'Conehey*, after a settlement of the partnership accounts, could be taken on the execution, to pay the separate debt of one of the partners. This is the rule in chancery,† and it has been recognised and adopted by the supreme court.‡

*T. A. Emmet*, in reply, said, that the complainant must always stand on the *equity of his own bill*. There is no allegation in the bill of a *notice* of the respondents' interest, at the time of the shipment. The replication put in issue nothing but the facts alleged in the bill, and denied or avoided by the answer. It is true, where a day is alleged under a *videlicet*, it may be proved to be any other time, provided it is not inconsistent with the equity of the bill.

If the respondents were partners, the fact of notice was immaterial. Notice after the shipment could avail nothing; but the fact of notice was not put in issue; the proof ought not, therefore, to be considered.

The respondents though they had documentary evidence of the value of the outward cargo, have not produced it, but have left the court to grope in ignorance on the subject. The appellants have not been paid the amount of their advances for the purchase of the cargo; there will be at least 100 dollars due to them, after deducting all they have received from *Archer & M'Conehey*.

The partnership between *Archer & M'Conehey* and the respondents, commenced with the purchase of the cargo. The purchases were made in gross by *Archer & M'Conehey*. It was sent undivided to *Laguira*, and sold together on joint account, and the parties were jointly to share the profit or loss. This case is different from that of *Saville v. Robertson and another;*§ there each party bought his own particular stock, and, afterwards, they made a joint adventure of the whole. The *copper* for sheathing was admitted to be a joint concern of all the parties; and had all the property been purchased in the same manner, all the parties would have been liable as partners. Could not the persons of whom the outward cargo was purchased have maintained an ac-

§ 4 Term
Rep. 720.

tion against the respondents and *Archer & M'Conehey*, for the amount? Here was a community of goods, without marks or distinction, and a community of the profit and loss, which constitutes a partnership. If a partner or joint owner acts as a supercargo or agent, he does not thereby lose his character as owner. He still retains his right to a share in the profits, with an additional compensation for his extra trouble. His acts, therefore, as regards third persons, are to be considered as those of a partner, and as such must bind his copartners.

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

The return cargo when it arrived at *Norfolk* was still undivided. It was sold by *M'Conehey* and converted into money, with which bills of exchange were purchased and sent to the appellants expressly to pay them the amount they had advanced. It is absurd to suppose that the original owner, in such a case, could procure his coffee, after it had been converted into money. *M'Conehey*, in his answers, as a witness, has given three different accounts of the object of the remittance, but his letters clearly show that they were not remitted for the benefit of all concerned, but specifically to pay the appellants. It was remitted to pay a just debt. This is not a struggle between creditors; but between a creditor and a debtor. If the respondents are partners, then the whole debts of the concern must be paid, before they can claim their proportion of the proceeds. Admitting even that the appellants had received the bills as agents for the concern, they would have a lien upon them, and might retain them until their accounts with the concern were settled and paid. The respondents have a remedy at law. They might maintain an action for money had and received for their use, if their demand be just. If it was a partnership transaction, then *Archer & M'Conehey* and *Grinnell* ought to have been made parties.

The allegation of fraud in this case, is the same as in a common action of *assumpsit* at law.

YATES, J. not having heard the argument of the cause, gave no opinion.

VAN NESS, J. was of opinion that the decree of the court of chancery ought to be *affirmed*, and gave his reasons.

THOMPSON, J. The rights of the parties in this case have been considered as depending principally upon the question of

IN ERROR.

ALBANY,
March, 1812.

Post
v.
Kimberly.

partnership, between *Kimberly & Brace* and *Archer & M'Cone-hey.* The appellants cannot, either on principles of law or equity, resist the decree against them, without establishing such partnership. It cannot, in my opinion, with any plausibility, be contended that the respondents and *Archer & M'Conehey* were, as between *themselves,* partners in the purchase of the outward cargo of the *Elizabeth.* For a partnership is a voluntary *contract* between two or more persons, for joining together their money, goods, or labour, &c. upon some *agreement* respecting them. It is, therefore, a relation between parties created by *contract,* and as it respects their relative rights among themselves, must depend upon the terms of such contract. There is in this case not only the want of any positive proof of such agreement, but the door is shut against every presumption of its existence, by direct proof to the contrary. *Archer & M'Conehey* both testify that *Kimberly & Brace* were owners of one fourth part of the cargo *separately* and *distinctly* from the other three fourths owned by themselves. Whatever concern, if any, they had in the purchase, was in the character of agents. The payment for the one fourth was made by *Kimberly & Brace* on their own separate account. In addition to which, it is also proved that *Kimberly* refused to purchase, or become responsible for any part of *Archer & M'Conehey's* proportion. Such a concern, in no respect whatever, partakes of the nature of a partnership. Each house was to purchase and put on board the *Elizabeth* its aliquot part, without the concern or responsibility of the other. Suppose one or more of the pipes of brandy purchased by *Kimberly & Brace* had sprung a leak, or been lost in the transportation from the store-house to the schooner, no part of the loss would have fallen upon *Archer & M'Conehey.* There was, at all events, no joint risk, until the goods were on board the schooner. The language of Lord *Kenyon,* in the case of *Sheriff* v. *Wilkes,* (1 *East,* 51.) may with peculiar force be applied here : " That it is hard enough for one partner, in any case, to be able to bind another without his knowledge and consent, but it would be carrying the liability of partners for each other's acts to a most unjust," and, I would add, alarming extent, to consider transactions like this as creating a partnership.

This case is very analogous to that of *Saville* v. *Robertson and another,* (4 *Term Rep.* 720.) where several persons, who had no general partnership, nor any connexion with each other in trade, formed an adventure to the *East Indies,* each one to bring in his

1

own share, and it was held not to be a partnership as to the *pur-*

*chase* of the goods, so brought into the adventure. It was likened to
the case of several persons agreeing to enter into partnership, each
bringing in a stipulated sum of money, and each borrowing his pro-
portion of different persons, in which case it would be impossible to
say that the persons advancing the money could maintain actions
against all the partners, for the several proportions lent to each.

It may, however, be necessary to inquire, whether *Kimberly &*
*Brace* have so conducted themselves as to become responsible to
the appellants for the part of the cargo furnished by *Archer &*
*M'Conehey.* For if not, I am not aware of any principles of law
or equity that will authorize them to apply the property of *Kim-*
*berly & Brace* to the payment of their demand against *Archer &*
*M'Conehey.* It is, unquestionably, a settled rule of law, that al-
though with respect to each other persons may so limit their en-
gagement, as not to be regarded in law as partners, yet, as to their
transactions with the rest of the world, they may be liable to be
charged as such, if they have permitted such other persons to use
their credit, or hold them out to the world as jointly liable ; other-
wise great frauds and impositions might be practised. This rule
of law, however, is for the protection and security of those who
are ignorant of the true relation in which persons with whom they
deal may stand to others, more or less concerned with them. For
where a partnership is a limited one, and confined to a particular
business or transaction, and persons who deal with it know it to be
such, the partnership is not bound beyond the terms of it, by the
act of one partner in relation to his own private concerns. This
principle has been recognised by the supreme court, in a variety
of cases, and is undoubtedly the settled rule of law. (*2 Johns.*
*Rep.* 300. *4 Johns. Rep.* 251.) In this view of the case, it be-
comes a fit subject of inquiry, how far the appellants were apprized
of the concern which *Kimberly & Brace* had with *Archer &*
*M'Conehey* in this adventure.

But here an objection is raised, *in limine,* to the admissi-
bility of any evidence on this subject, because it is not alle-
ged in the respondents' bill in chancery. It would, I think,
be a sufficient answer, that no objection to this testimony was
made in the court below. Both parties have examined wit-
nesses to that point. But independent of this consideration, no
allegation of notice was necessary in the bill. The bill alleges
that the respondents were *separately* interested in, and owners of,
one fourth part of the adventure or cargo. This the appellants

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

deny, and insist that it was a partnership concern with *Archer &*
*M'Conehey;* but allege that they did not know that any person
besides *Archer & M'Conehey* had any interest in the adventure.
This is matter, then, set up in the answer; and the truth or falsity
of it may be inquired into, as matter of fact, precisely within the
rule laid down, by Mr. Justice *Spencer,* in the case of *James* v.
*M'Kernon.* (6 *Johns. Rep.* 559.) He says it makes no differ-
ence whether a defendant has, by way of avoidance, set up a dis-
tinct and independent fact, or merely denied the matter in the bill.
If the existence and verity of the fact, thus set up by the defend-
ant, be controverted, the defendant must prove it, *and the com-
plainant may examine witnesses to disprove it.* But the fact be-
ing made out by the defendant, the complainant could not impeach
it, on the ground of fraud, if not charged in his bill. If the proof,
as to the notice was admissible, the fact appears to be established
by *Archer & M'Conehey.*

 *Archer* says the respondents were interested in, and owners of,
one fourth part of the outward and return cargo, and of the pro-
ceeds and avails thereof, *separately* and *distinctly* from *Archer &*
*M'Conehey;* and that at the time of the shipment to *Laguira,*
he informed *Russell* that the respondents were interested in one
fourth part of the schooner and cargo; and he thinks it was known
to *Post,* but is not certain on that point. *M'Conehey* says the
respondents were *separately* interested in, and owners of, one
fourth of the vessel and cargo; and that when he was about
purchasing the cargo, for the schooner, in *New-York,* he informed
the appellants that they were, or were to be, *so interested.* The
credit of these witnesses has been examined into, and fully esta-
blished. It must, therefore, be considered as proved that the
appellants knew, at the time of the shipment, of the interest of
the respondents in the adventure; and if they are chargeable
with knowledge of the special and limited nature of the respond-
ents' interest and concern, there can be no possible grounds, ac-
cording to the doctrine contained in the cases already cited, upon
which the respondents can be made liable for the advances to
*Archer & M'Conehey,* to purchase their proportion of the cargo.

 The conduct of the appellants throughout shows that they did
not consider *Kimberly & Brace* responsible to them. If there
was a partnership between *Archer & M'Conehey* and the respond-
ents, in any part of this adventure, it was in the *outward cargo*
only; and that partnership commencing with the shipment on

IN ERROR.

ALBANY,
March, 1812.

POST
v.
KIMBERLY.

board the *Elizabeth.* And I am inclined to think, that thus far they are to be considered partners. They thus became jointly interested in the cargo, in proportion to their respective shares. A loss of any part of it, during the voyage, must have been borne by them at the same rate, and they were jointly interested, in the like proportion, in the profit or loss, on the sales at *Laguira.* This view of the subject reconciles what might otherwise appear to be an inconsistency in the testimony of *Archer,* who, though he swears that the interest of the respondents in the proceeds and avails of the cargo, was *separate* and *distinct* from that of *Archer & M'Conehey,* yet that the cargo was *sent* to *Laguira* as partnership property, in which the parties had an undivided interest, as to profit and loss, according to their respective proportions of interest, before mentioned. But this partnership did not extend to the return cargo. A partnership being matter of contract between parties, they may limit and modify it at pleasure. There is, therefore, no incongruity in admitting a partnership in the outward cargo, and not in the return cargo, if such was the agreement of the parties, or the necessary inference of law, from the facts proved. It is true, that the proceeds of the outward cargo was to be invested in a return cargo. But there was no agreement to share in profit or loss, on the return cargo; nor any provision for a joint sale on its arrival in *New-York.* It is, necessarily, therefore, to be inferred, that each party was to take his share of the coffee, and dispose of it, at pleasure, without any community of interest, as to profit or loss. Here, then, was the want of one of the most essential requisites of a partnership. For a joint concern in the *future sale* is necessary to constitute a partnership, otherwise there is no communion of profit and loss. This was the principle which governed the decision in the case of *Coope and others* v. *Eyre and others.* (1 *H. Bl.* 48.) The same doctrine was recognised and sanctioned by the supreme court in the case of *Holmes* v. *The United Insurance Company.* (2 *Johns. Cas.* 331.) With respect to the return cargo, the rights and interests of the respondents, and *Archer & M'Conehey,* are to be viewed precisely in the same light as if they had sent out cash to *Laguira,* to be invested in a cargo of coffee, to be divided between them on its arrival in *New-York.* If this be the true character of this transaction, as I am persuaded it is, there is no ground, in my opinion, for the claim set up on the part of the appellants. But admitting a partnership to have commenced with

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

the *shipment* of the outward cargo, and continued throughout the adventure, it would give no legal right to the appellants, to apply the respondents' proportion to the payment of the separate debts of *Archer & M'Conehey*, contracted before the commencement of the partnership.

The law is well settled that if a person takes a partnership security from one of the partners for what is known at the time to be the particular debt of the partner who gives such security, the copartner is not holden. This was the rule laid down by the supreme court, in the case of *Livingston* v. *Roosevelt*, (4 *Johns. Rep.* 271.) and is in conformity to numerous adjudged cases there referred to, both in the equity and common law courts in *England*. The knowledge in the creditor that the partnership name is given for the individual debt of one partner, renders the transaction, in judgment of law, fraudulent and void. And this rule is not confined to *securities* given, but extends to *payments* actually made. Lord *Ellenborough*, in the case of *Swan* v. *Steele*, (7 *East*, 213.) says, that if a creditor of one of the partners collude with him, to take *payment* or *security* for his individual debt out of the partnership funds, knowing, at the same time, that it is without the consent of the other partner, it is fraudulent and void. So in the case of *Field and another*, in the court of exchequer, in *England*, (4 *Ves.* jun. 396.) it was held, that a separate creditor of a partner has no right against the joint property of the partnership, any further than the separate interest of that partner.

To apply those principles to the case before us. The demand of the appellant was against *Archer & M'Conehey* alone. *Kimberly & Brace* were clearly interested in the return cargo, and that fact was known to the appellants. With this knowledge, the funds of the partnership came into their hands; and before the payment of the bills, which constituted the funds, they admit the respondents gave them notice of their interest, and demanded of them their proportion of the proceeds of the return cargo. Under these circumstances, the application of these funds to the payment of the demands of the appellants against *Archer & M'Conehey*, was unauthorized in law. The receipt of the bills was not itself a payment, nor could it in any way affect the appellants' remedy against *Archer & M'Conehey*. These bills not having been paid, nor any release or discharge given to the respondents, it was nothing more than a pledge, as a security for the demand, and which was in no way binding upon

IN ERROR.

ALBANY,
March, 1812.

POST
v.
KIMBERLY.

the respondents. One of several partners cannot pledge the partnership fund for his individual debt so as to bind his copartners. But the appellants have not even this pretext as a shield, for *M'Conehey* says the remittance was made for the benefit of the whole concern, and denies altogether any intention of applying the respondents' proportion to the reimbursement or payment of the appellants, but meant only to deposite the whole with them, until he himself should come and make the necessary arrangements respecting the application of the three fourths belonging to him and *Archer*. The omission to mention any thing in his letters on this subject, affords no inference against him. All the letters respecting the bills were written within the space of twenty days. None of the bills were payable under ninety days after sight, and he probably expected to be in *New-York* before they fell due. Besides, he was writing to persons whom he had previously informed of the interest of the respondents in this adventure, and it would have been superfluous again to repeat it.

It was suggested, though not much pressed on the argument, that the respondents' remedy, if any they had, was complete at law, and, therefore, not proper for a court of chancery. It by no means follows, even admitting the remedy complete at law, that the court of chancery has not also jurisdiction. It cannot be denied, at this day, but that there are many subjects upon which courts of law and equity have concurrent jurisdiction. Matters of account form one class of this description of cases, with respect to which the court of chancery has a very broad jurisdiction, as the course of proceeding in that court has been considered peculiarly well calculated for the settlement of accounts, if they are in any degree long and complicated. This objection ought not to be very favourably received in this stage of the cause. Pleas to the jurisdiction of a court, being rather objections of form, ought to be interposed at the earliest opportunity. The party ought not to be suffered to wade through a tedious and expensive litigation, and then, in the very last stage of the cause an objection to be made to the jurisdiction of the court, especially where the subject matter of the controversy is within such jurisdiction. This question was discussed and examined very much at large, in this court, in the case of *Ludlow* v. *Simond*, (2 *Caines' Cases in Error*, 1.) where it will be found that the principles above suggested are recognised and supported by numerous authorities.

In whatever light, therefore, the subject is viewed, it appears to me, that even applying to the case the most rigid rules of law,

*IN ERROR.*
......
ALBANY,
March, 1812.

Post
v.
Kimberly.

applicable to partnership transactions, the respondents are entitled to recover one fourth part of the proceeds of the return cargo. This is manifestly consonant to the real justice and equity of the case. That one fourth part both of the outward and return cargo did, in fact, belong to the respondents, is not denied. And it is sufficiently proved that this was within the knowledge of the appellants. No false colours were held out to them to procure the advances made to *Archer & M'Conehey.* The advances were made altogether upon the credit of *Archer & M'Conehey,* whether the appellants knew or did not know of the interest of the respondents in the adventure. If the advances were made, under a promise and expectation of being reimbursed out of the proceeds of the return cargo, and under an ignorance of the respondents' interest, three fourths of the whole proceeds is all they could have looked to for a reimbursement, according to the admissions in their answer. For they say, that the advances were made on the promise of *Archer & M'Conehey,* that the return cargo, being the *avails* of property purchased by *means of their advances,* should be deposited with them. This could only extend to three fourths of the return cargo, for no more was purchased by means of their advances. The other fourth was purchased by means of advances made by *Kimberly & Brace.* Giving the appellants three fourths, will put them precisely in the same situation as if the respondents had had no concern in the adventure, for the outward cargo would then have been one fourth less in value. The appellants, in their answer, do not pretend that their advances and responsibilities, for the cargo of the *Elizabeth,* exceeded 12,000 dollars, and their own witness, *Grinnell,* swears it was about 11,000 dollars. And they admit that they have received upwards of 14,000 dollars. Upon their own showing, therefore, they have been more than reimbursed for their advances. The adventure of the *Hiram,* with which the respondents had no concern whatever, ought to be laid out of view. It would be extremely unjust to throw any part of that loss upon *Kimberly & Brace.* I think, therefore, the equity of the case is clearly with the respondents, and that this equity is supported by the strict and technical rules of law ; and, of course, that the decree ought to be affirmed.

SPENCER, J. The first point arising in this case is, whether *Kimberly & Brace,* in judgment of law, were partners with *Archer & M'Conehey,* in the purchase of the outward cargo of the schooner

IN ERROR.
••••••
ALBANY,
March, 1812.
POST
v.
KIMBERLY.

*Elizabeth.* If such limited partnership existed, the decree pronounced in the court of chancery cannot be supported. The basis of that decree is, that *Kimberly & Brace* had a distinct and independent interest in one fourth of the outward cargo, and had a right to call on the appellants, into whose hands the proceeds of the return cargo came, to account with, and pay to them, the one fourth part of those proceeds. If this principle was incorrect, and if the respondents were partners in the outward cargo, and jointly liable with *Archer & M'Conehey* to the appellants, for the advances made to them, then, so far from having any equity on their side to call out of the appellants' hands the money received by them, (assuming it at present to be the proceeds of the outward cargo,) they would be liable, as dormant partners, for the credit given by the appellants to *Archer & M'Conehey.*

[His honour here stated the pleadings and evidence in the cause.]

These are the material facts in considering whether the respondents and *Archer & M'Conehey* were partners in the adventure, including the purchase of the cargo.

It is a principle that will not be denied, that to entitle a party to recover money of another, he must have a superior right to it. It is not enough for a man to show that he has sustained a loss; he must go further, and establish a paramount right to the money he claims. As it regards the appellants, they have equal equity with the respondents. The appellants have advanced their money to *Archer & M'Conehey,* looking to the return cargo of the *Elizabeth,* to be refunded, and, in my opinion, they have a right to keep what they have acquired in the regular course of business, to the full extent of their responsibilities for, and advances to, *Archer & M'Conehey.*

Was the purchase of the outward cargo a partnership concern between the respondents and *Archer at M'Conehey?* I think it was, and that all the authorities support me in this opinion.

A partnership is defined to be a community of interest between two or more, and a sharing of profit and loss. Again, it is defined to be the voluntary association of two or more persons, in sharing the profits and bearing the losses of a general trade, or a specific adventure. *Watson (on Part. 40.)* says, " there may be special partnerships, which are formed for a particular concern in a single dealing or adventure. Thus two merchants may join in sending out a cargo of goods to a foreign country; as to this adventure they have all the rights and are subject to all the liabilities of partners,

IN ERROR.

••••••

ALBANY,
March, 1812.

POST
v.
KIMBERLY.

* Puff. lib. 5.
cap. 8.

but the relationship of partners ceases with it, and at no time extends to their other concerns." Again, he says, " if several either build or purchase a ship, they are part owners and partners as to this concern;" that is, they are tenants in common, as respects each other, and partners, as regards third persons, if the ship be employed, in whatever concerns her outfits, or the transactions with other persons relating to her.    Again, *Puffendorf** defines a partnership, " *Contractus societatis est, quo duo pluresve inter se pecuniam, res aut operas conferunt eo fine, ut quod inde redit lucri inter singulos pro rata dividatur.*"

To constitute a partnership in a particular purchase, or in a single concern, there must either be a joint undertaking to pay, or an agreement to share in the profits and loss.

A case much relied on by the respondents' counsel was *Saville* v. *Robertson and another;* (4 *Term Rep.* 720.) and it was supposed to establish the principle, that the partnership between the respondents and *Archer & M'Conehey* did not begin until after the purchase of the outward cargo.    That case was shortly this; several persons, unconnected as partners in trade, formed an adventure to the *East Indies*, and it was agreed that they should provide a cargo of goods for the intended voyage, to a specific amount, and each was to bring in his own particular stock, and as to these goods the concerned were to share in profit and loss. One *Pearce* owned the ship, which was valued at 3,750*l.* which he put in, as his part of the adventure.    And it was agreed that one should not be bound for any goods or stores ordered or shipped for the other, and *Pearce* was to be at liberty to ship what goods he pleased over and above the ship and outfit, leaving room for the goods to be shipped by the others.    After this agreement, the plaintiff in the suit supplied copper to sheath the ship, and furnished other copper, by *Pearce's* orders, as part of the cargo.    It was admitted, that the copper for sheathing was a partnership concern, and it was held by the court that the partnership as to the cargo, did not commence till all the parcels of the cargo were delivered on board.    Mr. Justice *Ashhurst* held, that the partnership began immediately, and that the several persons who embarked in the adventure were legally liable for the copper sold *Pearce* for the cargo.    He says a partnership is a joint undertaking to share in the profit and loss, and that it was a joint concern in the ship as well as the cargo.    If this case be law, which I think may be well doubted when other cases are compared with

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

it, there is yet one striking difference between it and the case before us; here, the outward cargo was purchased in gross, without any designation as to the persons furnishing it; there, each one was to bring in his own particular stock. Again, with respect to the copper furnished for sheathing, though it was laid out on the ship belonging to *Pearce*, yet it was admitted on all hands, that the whole were bound to pay for it, as partners. Now why were they answerable for that copper? Undoubtedly, on the ground that it was furnished for a subject in which they were jointly concerned, and had not the agreement between the parties in that case required each to bring in his own particular stock, they would have been held to have been partners. Had the adventurers in that case employed one person to purchase the whole stock, as in this case, they would, *ipso facto*, have been partners.

The case of *Hoare* v. *Dawes* (*Doug.* 371.) is also relied on to show that there was no partnership in this case. In the purchase of the outward cargo, in that case, several persons employed the same broker to purchase a lot of tea, of which they were to have separate shares, the lots being too large for any one dealer, and the question was, whether all the employers were partners, and answerable for the whole; and it was held that they were not, but that it was an undertaking with the broker by each for a particular quantity. Lord *Mansfield* observes, "there is no undertaking by one to advance money for another, *nor any agreement to share with one another the profits or loss.*

The next case is that of *Cooper and others* v. *Eyre.* (1 *H. Bl.* 37.) There a number of persons agreed together to buy up oil, and the defendants were to have for their shares, each one fourth of the oil. During the treaty, they declared it was a common concern between them and *Eyre & Co.* in whose names the purchases were made, without any information to the vendor that the defendants had any concern; and whether this constituted those who had so associated together partners, was the question. The court were divided on the point. *Wilson*, Justice, maintained that they were all answerable as partners. The other judges held it not to be a partnership. *Gould*, Justice, said the true criterion was, whether they were concerned in profit and loss. *Heath*, Justice, said, "in truth they were not partners, inasmuch as they were only interested in the purchase of the commodity, and not in the subsequent disposition of it." Lord *Loughborough* stated, that "in order to constitute a partnership, a community of profits and loss

IN ERROR.
......
ALBANY,
March, 1812.

POST
v.
KIMBERLY.

is essential; the shares must be joint, though it is not necessary they should be equal; if the parties be jointly concerned in the purchase, they must also be jointly concerned in the future sale."

The cases of *Hoare* v. *Dawes,* and *Cooper* v. *Eyre,* are very distinguishable from the present. The adventurers never had a community of interest, for the purpose of a joint future sale, or in the profit or loss attending the future sale. In the case before us, there was a perfect community of interest. The cargo was purchased jointly, though to be paid for separately, and it was to be resold by the concern, and the respondents were to share in the profit and loss of the future sale, in proportion to their interest, with *Archer & M'Conehey.* Had the tea, in the one case, and the oil, in the other, been purchased with a view to resell jointly, and to share in the profit and loss, can there be a doubt, from what fell from all the judges, that those cases would have been adjudged partnerships?

But the case of *Holmes* v. *The United Insurance Company* (2 *Johns. Cas.* 239.) is supposed to be an authority for the respondents. That case was an insurance on the cargo of a ship for the plaintiff's interest, as might appear. The cargo actually shipped belonged to the plaintiff and four others; one eighth of the ship and of the outward and return cargoes belonged to the plaintiff and four others, and these four had no concern in the insurance effected by the plaintiff. The insurance was directed on the plaintiff's account. The plaintiff's actual interest in the cargo on board, including the premium, was 14,200 dollars. The plaintiff had directed a shipment of goods at *Calcutta,* which failed, and the action was brought to recover, as a return premium, the difference between the defendant's subscription, and the interest of the plaintiff, on the ground of a short interest.

The opinion of the court was delivered by the present *Chief Justice,* and it contains a very clear and lucid exposition of the several cases already cited. He stated it as a test of a partnership, that there must be a reciprocal chain and agreement of the parties to unite their stock, and to share in all risks of profit and loss. And he observes, that " it is a strong and decisive fact in the case, that there was no agreement between the parties to share in the future sale of the return cargo;" and stress was laid on the manifest intention of the plaintiff to insure on his own account.

I perfectly accord in the decision of that case, for it was apparent that *Holmes* intended only to insure his own interest; that he was over insured, by not getting goods at *Calcutta*, and the court did right to make every possible intendment against a partnership set up for the purpose of pocketing a premium for a risk never contemplated by either party; but the case is too loosely stated, as to the manner of conducting the business between *Holmes* and the other part owners of the cargo, to be cited or relied upon, as establishing a general criterion on the question of partnership, where partnership or not is the very *gist* of the inquiry.

IN ERROR.
......
ALBANY,
March, 1812.
POST
v.
KIMBERLY.

The case of *The Assignees of Nixon* v. *Brush* (2 *Caines' Rep.* 293.) bears on the case before us; *Nixon* and *Brush* agreed to be equally interested in a vessel and cargo, equipping for a foreign voyage. *Nixon* advanced more than his proportion; and on the winding up of the business, a suit was brought for the balance; several objections were raised, all of which were overruled, except one, that an action would not lie at law, on the ground that there existed a partnership between *Nixon* and *Brush*. That objection was considered insurmountable, and we turned the plaintiff round to a court of equity. And, though I differed from the rest of the court in that decision, I admitted that all the owners might be answerable to third persons.

If the joint undertakers in a voyage are not, even as respects themselves, partners, it is utterly inconceivable why the plaintiff should be denied redress in a court of law, for an uncontroverted balance of accounts.

I pay no regard to the opinion of *M'Conehey*, when he says the goods were not sent to *Laguira* as partnership property, in contradiction to the fact to which he also testifies, "that the owners were only interested in the profits and loss thereof, according to each one's proportion of property on board."

*Archer & M'Conehey* differ in their testimony as to the laying in of the outward cargo. The respondents in their bill, and by that they must be concluded, allege, in express terms, "that the cargo was purchased and laid in, by *Archer & M'Conehey* for themselves and the respondents together, and in gross."

It appears to me, from a review of the cases, that *Watson* is correct in saying "that when two merchants join in sending out a cargo of goods to a foreign country, as to this adventure, they have all the rights, and are subject to all the liabilities, of partners."

IN ERROR.
......
ALBANY,
March, 1812.

Post
v.
KIMBERLY.

It cannot be admitted, for a moment, that the appellants' igno-rance of the fact, that the respondents were concerned in the adventure, when the credit was given to *Archer & M'Conehey,* for the outward cargo, will affect their rights; there is not a case to be met with which does not say that dormant partners, though unknown to the person giving the credit at the time, are equally answerable as though known. And in the case of *Hoare* v. *Dawes,* Lord *Mansfield* says, "the law respecting dormant partners is not disputed; that they are liable when discovered."

The result of my opinion, therefore, is, that the respondents were liable to the appellants, for the advances made to *Archer & M'Conehey,* for the purchase of the outward cargo, and that, therefore, they have no title to get back what by law they would have been compelled to pay, had it not been paid.

There is another ground, perhaps, more decisive. If we admit that the respondents were not partners, so far as relates to the putting in the outward cargo, they assuredly became so when it was put on board. There was, then, a perfect community of interest, and an agreement to share profits and loss, in proportion to their respective interests; and the case so much relied on, of *Saville* v. *Robertson and another,* (4 *Term Rep.* 720.) decides, that the partnership commenced when the cargo was put on board. Assuming this to be so, then *M'Conehey,* as one of the partners, had a complete control over the return cargo; this he disposed of, and remitted from *Norfolk* to the appellants bills to the amount of 12,000 dollars. This act of *M'Conehey* was binding on the respondents, as his partners in that adventure. To hold otherwise would, in fact, be maintaining that the sale of the return cargo by *M'Conehey* was a tortious act, so far as regards the respondents' share, and that they could maintain trover against the purchasers in *Norfolk.* The bills of exchange were remitted to the appellants, clearly for the purpose of paying their debt. This is manifest from *M'Conehey's* letters and from his testimony. The bills were received in the regular course of business, as cash, and the pre-existing debt was the consideration for them.

It is to me a novel and extraordinary idea, that if one partner sells the partnership property, and with the proceeds pays his own debt, that his copartners shall pursue this payment, and recover it back from the persons who had a right to receive it. The same remarks are applicable to the coffee sent on to the appellants from *Norfolk.* If a man should tortiously take my property and sell

it, and with the money pay his creditor, it might as well be contended, that I could recover the money thus paid, as that the respondents can recover the money which has, in the regular course of mercantile business, come into the hands of the appellants. On this ground, therefore, I am satisfied that the decree is wrong.

With respect to the notice given of the respondents' interest in the cargo, it is apparent from the bill, that it is not alleged as a ground of relief that the appellants had notice of the respondents' interest, until after they had acquired a right in the bills and in the coffee ; and whatever the appellants may have insisted on in their answer upon the subject of notice, it was not a point in issue between the parties, for the respondents' benefit. If the appellants could have proved that no notice was given, their answer would have allowed them to have done so by way of defence. If they have failed in proving this, the respondents cannot claim that they have proved notice, as a ground of equity on their side, because they have not made it a substantive ground in their bill ; and the case of *James* v. *M'Kernon* warrants this doctrine. We are, then, bound to consider the appellants as having received actual payment, in bills and coffee, of their debt, without notice that the respondents had any concern in the return cargo, and this takes away all equity on the part of the respondents.

The only remaining point is, as to the jurisdiction of the court of chancery ; and I must confess that I perceive no colour for it. The respondents claim on the ground that the appellants have received money to their use. Had a discovery been necessary, the bill might have been entertained for that purpose, but the bill is for relief also. If the well known boundary between courts of equity and law has been broken in upon by the present bill, as it seems to me it has, the bill ought, for that reason, to have been dismissed. If the court below ought to have dismissed it, this court should do it. Though not a stickler for forms, yet I am for keeping courts within their jurisdiction ; and am very much opposed to transferring questions of purely a legal nature to a court of equity.

I cannot subscribe to the doctrine, that because courts of equity have a concurrent jurisdiction, in matters of account, with courts of law, that a jurisdiction shall be assumed, under the notion of settling accounts, when the only matter of account is to ascertain how much a quantity of coffee sold for.

I trust that I have advanced nothing alarming in this opinion, and

IN ERROR.
......
ALBANY,
March, 1812.

Post
v.
KIMBERLY.

that I shall not be suspected of contending, that if several persons ship wheat to market, having no community of interest, nor not being to share in common the profits and loss attending its sale, that the mere circumstance of the carrier's intermingling it will create a partnership. But I do insist, that in the various points of view in which I have been able to consider this case, the decree is erroneous, and that, therefore, it ought to be reversed, with directions that the bill be dismissed.

KENT, Ch. J. It is a fact in the case, that *Kimberly & Brace* were owners of one fourth part of the cargo on board of the *Elizabeth,* and that it was purchased with their money. It is a further fact, that the proceeds of this one fourth part, as well as of the residue of the cargo, came to the possession of *Post & Russell,* and was appropriated to pay debts due to them from *Archer & M'Conehey.* The very statement of these facts shows that the apparent equity of the case is with *Kimberly & Brace;* for their property ought not to be taken from them to pay the debts of third persons, without their consent. Every man of plain, good sense, will at once see the justice of this conclusion, and he will immediately adopt it, unless restrained by some principle of law, or some technical rule of commercial policy applicable to the case, by which *Archer & M'Conehey* were enabled to bind and legally transfer the property of *Kimberly & Brace.*

I have examined the case with a view to such a rule, and I find none that applies.

1. Here was not, according to my view of the case, a partnership between *Kimberly & Brace* and *Archer & M'Conehey,* so as to render the disposition of the return cargo by *M'Conehey* binding, as the act of a partner, on *Kimberly & Brace.* This was considered by the counsel for the appellants as the most prominent point in the cause, and, therefore, it deserves the more attention. No person ought to be involved in the responsibilities of a copartnership, unless it be by his own consent and agreement, or unless his conduct be such as to deceive the world, and induce others to act under the belief that he is a partner. In this case, there was not only no partnership in fact, but none in appearance. If we examine the transaction from the beginning to the end of it, there will not be found the requisite evidence of a partnership association. There was no agreement that the first purchase should be made upon a joint credit, nor was there any agreement to be jointly

concerned in the final result of the adventure. *Kimberly &* *IN ERROR.*
*Brace* advanced their own money for the purchase of their one
fourth of the outward cargo, and *Archer & M'Conehey* acted only ALBANY, March, 1812.
as the common agents, in making the purchase. There was clearly
no partnership in the purchase of the outfit, and it was so far like Post v. KIMBERLY.
the case of *Saville* v. *Robertson and another.* (4 *Term Rep.*
720.) There was no more of a partnership act in this purchase,
than there was in the case of *Hoare* v. *Dawes,* (*Doug.* 371.)
where a broker was employed by a number of persons to purchase
a lot of tea, of which each was to have his separate share, and it
was held that they were not partners in the tea, because there was
no undertaking by one to advance money for another, nor any
agreement to share with one another in the profit or loss. ¶

Nor do I think that a partnership existed after the cargo was ship-
ped for *Laguira,* so as to affect this case, because there was no
agreement to share jointly in the *ultimate* profit and loss of the voy-
age. The appellants were bound to show, affirmatively, such an
agreement, and we are not to infer it, merely because the contrary is
not expressly shown. The parties had no previous partnership
or previous connexion with each other in trade, and we are to
make no intendment in favour of the partnership, so as to supply
the absence of facts. The supercargo was authorized to sell the
outward cargo, and with the proceeds of it to buy a return cargo,
and so far the loss and profit of that outward cargo might be joint
and mutual; and I am willing to admit, for the sake of argument in
this case, that there was a partnership responsibility so far as re-
spected the charge of transporting and selling the outward cargo;
but there the partnership terminated, and we have no proof, nor
ought we to presume any, that the return cargo was purchased for
joint profit and loss, and that they were to share jointly in its dis-
position. The parties were distinct commercial houses, and each
house would undoubtedly have been entitled to its distinct, *aliquot*
share or proportion of the return cargo, on its arrival at *New-York,*
and to have disposed of it, as each party thought proper, on his
own account and risk. *Kimberly & Brace* would have taken to
themselves the one fourth of the return cargo. Thus in the case
of *Coope and others* v. *Eyre and others,* (1 *H. Bl.* 37.) several
persons entered into an agreement to purchase a quantity of oil in
the name of *A.* only, and each was to receive his distinct share,
and it was held not to create a partnership. Because the sale was
to be joint at *Laguira,* (and that is the only thing that looks like a

*IN ERROR.*

......

ALBANY,
March, 1812.

POST
v.
KIMBERLY.

partnership in the whole case,) it does not follow that the subsequent sale was to be joint.   As the separate shares in the outfit were held by them as tenants in common, the sale of that cargo was necessarily joint; and so it is, if several persons send their wheat together in one sloop to market, with directions to the captain to sell it for the benefit of each, but their respective proportions of interest in the proceeds have never been considered as liable for each other's debts.

We must be careful not to carry the doctrine of constructive partnership so far as to render it a trap to the unwary. We must in this, as in other cases, look to the *entire* transaction, in order to judge correctly of its nature and tendency. If there be no previous general partnership, nor any purchase for a particular adventure, on a joint credit, nor any agreement to share jointly in the ultimate profit and loss of that adventure, nor any act imposing themselves upon the world, as partners, I humbly presume that there is no law or justice that would hold them liable as partners, beyond the particular expenses of the carriage and sale of the outward cargo.   To make the property of one party in the return cargo, answerable for the separate debts of the other party, appears to me to be both unreasonable and illegal.   The profit and loss of the voyage was never to be joint and mutual.   The eventual gain or loss of one party might be very different from that of the other, because each house was to act for itself in the disposition of its proportion of the return cargo. There is nothing in the case to contradict this conclusion, and this fact is with me decisive against the pretension of a copartnership. The interest of each party was never blended into one common stock of profit and loss, but preserved its distinct character, subject to its own profit and loss at the conclusion of the adventure. *Doris amara suam non intermisceat undam.*

2. If the act of *M'Conehey* was not binding on *Kimberly & Brace*, as the act of a partner, I know of no circumstances in the case to prevent *Kimberly & Brace* from compelling *Post & Russell* to account for one fourth of the proceeds of the return cargo.   One fourth came to their possession, and they insist upon a right to appropriate it, under the direction of *M'Conehey*, to pay his debts and those of the firm of *Archer & M'Conehey*, but *M'Conehey* had no authority to pledge this property of *Kimberly & Brace;* and *Post & Russell* had no right to apply it to their own use, if they were informed to whom it belonged.   Their debt

IN ERROR.

......

ALBANY,
March, 1812.

Post
v.
KIMBERLY.

was originally created on the credit of *Archer & M'Conehey*, and not of *Kimberly & Brace*. The bills of exchange were not taken, in the course of business, as cash. There was no consideration given for the bills when they were received. They were deposited with *Post & Russell*, by *M'Conehey*, to be collected and appropriated to the payment of their prior demands against *M'Conehey* and his partner. The receipt of the bills was not, of itself, a payment, and the notice which they admit to have received before the bills fell due and were paid, was sufficient to put them upon inquiry. If they afterwards passed the amount of the bills and the proceeds of the coffee to the credit of *Archer & M'Conehey*, they did it at their peril. It is, therefore, in this view, an immaterial fact, whether *Post & Russell* had notice, at the commencement of the voyage, of the interest of the respondents ; though I am of opinion that the weight of evidence is decidedly in favour of the allegation that they had such notice. And if that be the fact, (which, I think, is the weight of the evidence, and the point was sufficiently in issue,) then it becomes perfectly immaterial whether there was or was not a partnership. If there was one, yet the engagement of *M'Conehey* to bind the property of his copartners, without their consent, for his own private debts, was fraudulent as to him, and void (to say no more) as to *Post & Russell*, who took the engagement under such knowledge. But it is sufficient for this case, that they had notice while the bills remained in their hands to collect, and before they were due or paid. The subsequent receipt of the money by them on the bills, and on the coffee, formed the ordinary case of money received to another's use, and for which they ought to account.

Supposing they were liable to the respondents, it has not been made a question, either in the court below, or upon the argument here, whether chancery had not jurisdiction of the cause. Nor could there have been any doubt upon this point, if the question had been raised, for the court of chancery has a concurrent jurisdiction with the courts of law, in all matters of account, and so it was understood and decided by this court, in 1805, in the case of *Ludlow* v. *Simond*. (2 *Caines' Cases in Error*, 1.)

With respect to the coffee, there is some obscurity hanging over the case, and it is impossible to know exactly the truth. I am satisfied, however, with the relation of the master of the *Elizabeth*, who says, that the coffee was the proceeds of the outward cargo, and that the bill of lading which *M'Conehey* signed and gave to

*IN ERROR.*   *Grinnell* was given with reluctance ; and he says he always be-
  ......   lieved the bill of lading was given for property then on board the
ALBANY,   *Elizabeth,* belonging to the owners of the cargo shipped from
March, 1812.   *New-York.*   *M'Conehey* also says, that no part of the cargo pur-
Post   chased at *Laguira,* was purchased or shipped for *Grinnell.* As this
v.   was a voyage to the *Spanish* colonies, and probably a smuggling
KIMBERLY.   trade, it may account for some mystery and double dealing in the
transactions at *Laguira.*   I am well convinced that *Kimberly &*
*Brace* are as much entitled to their proportion of this coffee as of
the residue of the return cargo.   The law and the equity of the
case are equally with the respondents, and the decree ought to be
affirmed.

LEWIS, Senator, was of opinion that the decree of the court of
chancery ought to be *reversed,* and gave his reasons.

TAYLER, Senator, was of opinion that the decree of the court
below ought to be *affirmed,* and gave his reasons.

* *For. affirm-*   A majority of the court* being of opinion that the decree of
*ing, 14; for*
*reversing, 12.* the court below ought to be *affirmed,* it was, thereupon,

*March 10th,*   ORDERED, ADJUDGED and DECREED, that the decree of the
1812.   court of chancery be affirmed, and that the petition of appeal be
dismissed ; and it was further *ordered* and *adjudged,* that the re-
spondents recover interest on the sum reported by the master to
be due to them from the appellants, from the time the said report
was confirmed ; and also that the respondents recover 150 dollars,
for their costs, &c. and that the record be remitted, &c.

Judgment of affirmance.